IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FIDELITY AND DEPOSIT COMPANY OF MARYLAND | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 02-CV-2674 |
| v. | : | |
| ROYAL BANK OF PENNSYLVANIA | : | |
| Defendant. | : | |

# **ORDER**

AND NOW, this ___ day of _____, 2002, upon consideration of defendant Royal Bank of Pennsylvania's Rule 12(b)(6) Motion to Dismiss, and the response of plaintiff Fidelity and Deposit Company of Maryland thereto, it is hereby ORDERED and DECREED that said Motion is DENIED, and that defendant will file and serve its Answer to plaintiff's Complaint within ten days of the date hereof.

**BY THE COURT:**

_____
**EDMUND V. LUDWIG, U.S.D.J.**

DSB:845577.1/FID024-158178

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FIDELITY AND DEPOSIT COMPANY OF MARYLAND | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | NO. 02-CV-2674 |
| v. | : | |
| ROYAL BANK OF PENNSYLVANIA | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW OF PLAINTIFF
FIDELITY AND DEPOSIT COMPANY OF MARYLAND
IN OPPOSITION TO DEFENDANT ROYAL BANK
OF PENNSYLVANIA'S RULE 12(b)(6) MOTION TO DISMISS**

Plaintiff, Fidelity and Deposit Company of Maryland ("F&D"), by and through its undersigned counsel, hereby submits this Memorandum of Law in opposition[1] to the Rule 12(b)(6) Motion to Dismiss of defendant, Royal Bank of Pennsylvania ("Bank").

**FACTUAL BACKGROUND**

On February 22, 2001, Restoration & Preservation Systems & Services, Inc. ("RPSS") entered into a contract with the Commonwealth of Pennsylvania, Department of General Services, to perform general construction, and window and brick replacement at the State Correctional Institution at Graterford, Montgomery County, Pennsylvania ("Project"). A true and correct copy of the Contract between RPSS and the Commonwealth for the Project is attached hereto and incorporated herein as Exhibit "A."

---

[1]   Local Rule 7.1(c) provides that motions are to be opposed by brief, "together with such answer or other response which may be appropriate." Rather than burdening the Court with a cumulative paragraph-by-paragraph response to defendant's enumerated motion paper, F&D has set forth its complete opposition to defendant's position in this Memorandum of Law.

Pursuant to both the Contract and the Pennsylvania Public Works Contractor's Bond Law of 1967, 8 P.S. § 191, *et seq.*, RPSS was required to secure its payment and performance obligations on the Project with a bond. At RPSS's request, F&D issued Contract Bond No. PRF 851 8739 ("Bond") in the penal sum of $1,748,000.00 on February 1, 2001. *Complaint*, ¶ 10. A true and correct copy of the Bond (Exhibit "B" to the Complaint) is attached hereto and incorporated herein as Exhibit "B."

As an inducement for F&D's issuance of the Bond, RPSS, along with its principals acting in their individual capacity, executed an Agreement of Indemnity, which granted rights to F&D, including, but not limited to, an assignment of all of RPSS's rights in the proceeds of the Contract "to become effective as of the date of the Bond" in the event of RPSS's breach of the Contract. *Complaint*, ¶ 7. A true and correct copy of the Agreement of Indemnity (Exhibit "A" to the Complaint) is attached hereto and incorporated herein as Exhibit "C."

Approximately six months after the execution of the Indemnity Agreement and issuance of the Bond, RPSS executed an Assignment of Claims in favor of Royal Bank in connection with a purported non-revolving SBA loan in the amount of $522,100.00. *Complaint*, ¶ 12. A true and correct copy of the Assignment (Exhibit "C" to the Complaint) is attached hereto and incorporated herein as Exhibit "D." Prior to closing on its loan to RPSS, Royal Bank, in awareness of F&D's role as surety in connection with the Project, sought from F&D an acknowledgment of the existence of RPSS's Assignment of Claims to Royal Bank. *Complaint*, ¶ 13. By letter of August 8, 2001, F&D acknowledged the existence of the Assignment of Claims "subject to [F&D's] rights as surety in the event of a default" by RPSS on the Project. A true and correct copy of the August 8, 2001 letter (Exhibit "D" to the Complaint) is attached hereto and incorporated herein as Exhibit "E."

Beginning in February, 2002, and continuing through the present, F&D received numerous notifications of claims from various subcontractors of RPSS on the Project that they had not received payment from RPSS for work performed on that Project. *Complaint*, ¶ 15. Moreover, on or about March 7, 2002, RPSS irrevocably and voluntarily abandoned and terminated its work on the Project, triggering F&D's performance obligations under the Bond. *Complaint*, ¶ 15. To date, F&D has paid in excess of $500,000.00 in satisfaction of the aforesaid subcontractor claims, and in performance of the Project itself, exclusive of F&D's own expenses. *Complaint*, ¶ 19.

On or about February 15, 2002, the Commonwealth issued its check no. 8138862 in the amount of $222,267.00 ("Funds") to Royal Bank as assignee of RPSS's right to receive progress payments in the Project. *Complaint*, ¶ 20. However, despite F&D's repeated requests for Royal Bank to tender the Funds, Royal Bank wrongfully deposited and continues to retain the progress payment to which F&D is absolutely entitled. *Complaint*, ¶ 21.

On May 3, 2002, F&D instituted the above-captioned action against Royal Bank to recover the Funds, based upon Royal Bank's conversion, unjust enrichment and tortious interference with contract. Presently before this Court is Royal Bank's motion to dismiss all of F&D's claims. Royal Bank's motion rises and falls upon its single argument that the "Complaint must be dismissed because it is based entirely on the unsupported legal premise that as a general unsecured surety bond claimant, somehow it [F&D] has superior rights to the Commonwealth's payments to Royal than Royal itself, which holds a perfected first lien on the Commonwealth's payments." *Royal Bank Brief,* pp. 2-3. Quite to the contrary, as set forth below, it is Royal

Bank's position that is legally insupportable, because Pennsylvania law mandates priority of F&D's interest in the contract proceeds.[2]

## ARGUMENT

### Legal Standard

Royal Bank's motion is based upon F&D's purported "failure to state a claim upon which relief can be granted."[3] Fed R. Civ. P. 12(b)(6). "A court should not dismiss a complaint under Rule 12(b)(6) for failure to state a claim for relief 'unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief.'" *Pryor v. NCAA*, 288 F.3d 548, 559 (3rd Cir. 2002), *citing Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). "At this stage of the litigation, [the court] must accept [plaintiff's] allegations as true." *Hishon v. King & Spalding*, 467 U.S. 69, 65 (1984). Moreover, the court must draw all "reasonable inferences . . . to aid the pleader." *D.P. Enterprises v. Bucks County Community College*, 725 F.2d 943, 944 (3rd Cir. 1984).

---

[2] The issues herein were the subject of voluminous correspondence directed by both parties to the Commonwealth's Office of General Counsel. While the Commonwealth's opinion in this matter is not binding upon this Court, it is instructive. After reviewing the respective documentation and claims of the parties, the Commonwealth "determined that the Surety's rights to payment take precedence over the Bank's rights as expressed in the assignment of payment agreement." A true and correct copy of the May 21, 2002 letter of Jan Tamanini, Assistant Chief Counsel – Public Works, is attached hereto and incorporated herein as Exhibit "F."

[3] Although styled as a motion under Rule 12(b)(6), Royal Bank has appended exhibits that were neither part of F&D's Complaint nor appear elsewhere in the record. F&D requests that this Court exclude consideration of defendant's exhibits, as they do not bear on the issues herein. However, this Court has the discretion to address evidence outside the record in ruling on the present motion. *Kulwicki v. Dawson*, 969 F.2d 1454 (3rd Cir. 1992). If such evidence is considered, then the motion is, by the express provisions of Rule 12(b), treated as one for summary judgment under Rule 56. In the event that this Court does consider such materials, then F&D respectfully requests that the same consideration be given to Exhibits "A" and "F" hereto, which are not part of the existing record in this action.

## F&D's Right of Equitable Subrogation
## Entitles It to Priority in the Remaining Contract Balance

F&D bonded RPSS's performance and payment obligations on the Project as required by the Contract, which requires RPSS to submit

> a Contract Bond, or Bonds, on the form provided by the Department, in the penal sum equal to the amount of the awarded Contract, for the faithful performance of the Contract, and to cover the prompt payment in full for all materials furnished and labor supplied or performed and equipment actually rented.

*Contract, Instruction to Bidders*, A.33.

The Contract, which not only requires the Bonds, but incorporates them therein (*Contract, Standard Form*, 9.3), does so pursuant to the Pennsylvania Public Works Contractor's Bond Law of 1967, 8 P.S. § 191, *et seq.*, which provides, in pertinent part:

> **§ 193.  Bonds required; types; sureties; filing**
>
> (a) Before any contract exceeding five thousand dollars ($5,000) for the construction, reconstruction, alteration or repair of any public building or other public work or public improvement, including highway work, of any contracting body is awarded to any prime contractor, such contractor shall furnish to the contracting body the following bonds, which shall become binding upon the awarding of said contract to such contractor:
>
> (1) A performance bond at one hundred percent of the contract amount, conditioned upon the faithful performance of the contract in accordance with the plans, specifications and conditions of the contract.  Such bond shall be solely for the protection of the contracting body which awarded the contract.
>
> (2) A payment bond at one hundred percent of the contract amount.  Such bond shall be solely for the protection of claimants supplying labor or materials to the prime contractor to whom the contract was awarded, or to any of his subcontractors, in the prosecution of the work provided for in such contract, and shall be conditioned for the prompt payment of all such material furnished or labor supplied or performed in the prosecution of the work. "Labor or materials" shall include public utility services and reasonable rentals of equipment, but only for periods when the equipment rented is actually used at the site.

The Pennsylvania Bond Law is virtually identical to the federal Miller Act, and both the federal and state courts in Pennsylvania have noted that "decisions of the federal court in Miller Act cases have been helpful in determining the proper construction of the state bonding law." *Nicholson Construction Company v. The Standard Fire Insurance Company*, 760 F.2d 74, 77 (3rd Cir. 1985) *citing Commonwealth v. National Union Fire Insurance Company*, 434 Pa. 235, 252, A.2d 593 (1969) and *Jacobs v. Northeastern Corp.*, 416 Pa. 417, 206 A.2d 49 (1965). The seminal case determining that a performing surety is entitled to receive the remaining balance on a bonded contract ahead of other creditors is *Pearlman v. Reliance Insurance Company*, 371 U.S. 132 (1962). There, the Supreme Court noted that "there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed. This rule, widely applied in this country [is] generally known as the right of subrogation." *Pearlman*, 371 U.S. 132, 136-137. The Court went on to hold that the surety that satisfies payment bond claims of its principal's subcontractors becomes entitled through subrogation to remaining contract proceeds in the project owner's possession, and that the surety that expends funds in excess of the remaining contract balance, "has a right to all of it." *Pearlman*, 371 U.S. at 142.

In *Jacobs v. Northeastern Corporation*, 416 Pa. 417, 206 A.2d 49 (1965), the Supreme Court of Pennsylvania adopted *Pearlman* in deciding a case with issues similar to those herein. In *Jacobs*, the bonded principal was placed in receivership and its sureties were called upon to satisfy various payment bond claims. The principal's receiver opposed the sureties' requests for the remaining contract balance, contending that they only held the status of general unsecured creditors. In holding that the sureties were entitled to priority in receipt of the contract funds, the *Jacobs* Court noted that had "the surety not paid the labor and materialmen, the funds held by the

Commonwealth agencies would not have been available to the general creditors. Since the sureties stand in the places of those whose claims they have paid, as persuasively pointed out in *Pearlman*, the funds must be paid to the sureties, just as the funds would have gone, in the absence of a bond, to the labor and materialmen rather than to the general creditors." *Jacobs v. Northeastern Corp.*, 206 A.2d 49, 54.  In *Jacobs*, the receiver unsuccessfully argued, as does Royal Bank herein, that because the sureties did not file financing statements, their "unperfected" security interests could not prevail over other creditors.  In the words of the *Jacobs* Court:

> The issue simply is: Were they required to do so? We hold that they were not.
>
> None of the purposes or objectives of the Code's filing requirements would be served by holding that the subrogation to the contract balance now due is an assertion of a 'security interest' and therefore subject to the filing provisions of Article 9. The contract balance withheld would never have become due and payable to [principal] (or its receiver or creditors) as long as [principal] defaulted on its obligation to pay labor and materialmen. Payment of the retained balance became due and available *only* upon performance by the sureties of [principal's] obligations. . . .
>
> Of basic importance is the general rule of Section 9-102(2) that Article 9 'applies to security interest *created by contract.*' Rights of subrogation, although growing out of a contractual setting and oft times articulated by the contract, do not depend for their existence on a grant in the contract, but are created by law to avoid injustice. **Therefore, subrogation rights are not 'security interests' within the meaning of Article 9. The sureties' rights of subrogation, having been created by operation of law, are not the usual type of consensual security interests contemplated by the Code.**

*Jacobs*, 206 A.2d at 55 (bold emphasis added).

In *Himes v. Cameron County Construction Corp.*, 289 Pa. Super 143, 432 A.2d 1092 (1991), *aff'd.* 497 Pa. 637, 444 A.2d 98 (1982), a bank claimed priority in unpaid contract funds,

based upon the bank's filing of UCC filing statements referencing an assignment and security interest granted by the contractor in the proceeds of the bonded construction contract.  At the project's conclusion, an unpaid supplier sought payment from the remaining contract funds, to which the bank claimed a priority interest.  However, in *Himes*, as here,[4] the bank's assignment provided that the bank only became entitled to contract funds due or to become due, since the contractor cannot assign greater rights than it actually holds.  The *Himes* Court held "that the Bank never gained any rights to the disputed fund in the instant case because the Contractor never attained such rights [due to its default].  Thus, the Bank has no security interest whatsoever on which to base its claim."  *Himes*, 432 A.2d 1092, 1097.

Here the failures on the part of RPSS entitled Commonwealth to withhold the payment of contract proceeds to RPSS.  The Contract provides that "it is within the Department's discretion to withhold payment because of the Contractor's failure to pay subcontractors or suppliers."  *Contract*, 11.6(7).  It further provides that the Commonwealth may withhold payment upon "reasonable indication that the work will not be completed within the contract time" or "unsatisfactory prosecution of the work by the Contractor."  *Contract*, 11.6(5), (6).  Just as the contractor in *Himes* had no right to the remaining contract balance, and thus possessed no right to assign, RPSS had no entitlement to the remaining funds herein, and as such, could not assign such rights to Royal Bank.

*Jacob*'s and *Himes*' rejection of the argument that subrogation rights are Article 9 security interests is neither novel nor limited to Pennsylvania.  For instance, in *Transamerica Insurance Company v. Barnett Bank of Marion County*, 540 So. 2d 113 (Fla. 1989), the Supreme

---

[4]   RPSS' Assignment of Claims to Royal Bank covers "all moneys and claims for moneys due or to become due to" RPSS under its Contract with the Commonwealth.  *See* Exhibit "D" hereto.

Court of Florida held that a surety's equitable subrogation rights had priority over a bank's perfected security interests in contract proceeds, and stated:

> The overwhelming and essentially unanimous post-U.C.C. decisions in this country, federal as well as state courts, have held that (1) the surety's equitable right of subrogation is not a consensual security interest, (2) no U.C.C. filing is necessary to perfect the surety's interest, and (3) the surety's interest continues to be, as it was under pre-Code law, superior to the claim of a contract assignee, such as a bank.

*Transamerica Insurance Company*, 540 So. 2d 113, 117, citing *National Shawmut Bank v. New Amsterdam Casualty Co.,* 411 F.2d 843 (1st Cir. 1969); *In re J.V. Gleason Co.,* 452 F.2d 1219 (8th Cir. 1971); *Home Indem. Co. v. United States,* 193 Ct. Cl. 266, 433 F.2d 764 (1970); *First Alabama Bank v. Hartford Accident & Indem. Co.,* 430 F.Supp. 907 (N.D. Ala. 1977); *Third Nat'l Bank v. Highlands Ins. Co.,* 603 S.W.2d 730 (Tenn. 1980); *Alaska State Bank v. General Ins. Co.,* 579 P.2d 1362 (Alaska 1978); *Argonaut Ins. Co. v. C & S Bank*, 140 Ga.App. 807, 232 S.E.2d 135 (1976); *Financial Co. of America v. United States Fidelity & Guar. Co.*, 277 Md. 177, 353 A.2d 249 (1976); *Canter v. Schlager*, 358 Mass. 789, 267 N.E.2d 492 (1971); *United States Fidelity & Guar. Co. v. First State Bank,* 208 Kan. 738, 494 P.2d 1149 (1972); *Travelers Indem. Co. v. Clark*, 254 So.2d 741 (Miss. 1971); *Jacobs v. Northeastern Corp.*, 416 Pa. 417, 206 A.2d 49 (1965); *White & Summers,* Uniform Commercial Code s 22-5 (2d ed. 1980).

The *Transamerica* case was cited with approval by the Third Circuit in *First Indemnity of America Insurance Company v. Modular Structures, Inc.*, 27 F.3d 72 (3rd Cir. 1994). There, in applying New Jersey law, the Court held that because a defaulting contractor was not "owed" contract funds held by a project owner, they were not subject to a bank's "superpriority lien," but rather belonged to the performing surety. *First Indemnity of America Insurance Company*, 27 F.3d 72, 80 (3rd Cir. 1994).

In yet another virtually identical case, the First Circuit noted in *National Shawmut Bank of Boston v. New Amsterdam Casualty Co., Inc.,* 411 F.2d 843, 849 (1st Cir. 1969), that "equitable subrogation is too hardy a plant to be uprooted by a Code which speaks around but not to the issue," and held that a performing surety had priority in contract proceeds over a secured bank. In a statement equally applicable to this case, the *National Shawmut* Court explained equitable subrogation as follows:

> In this case there is confusion because the tendency is to think of the surety on Miller Act payment and performance bonds as standing in the shoes only of the entity it 'insures' – the contractor. So long as this one-dimensional concept prevails, logic compels the surety to be assessed as merely one of the contractor's creditors, and to be subject to the system of priorities rationalized by the Uniform Commercial Code. But the surety in cases like this undertakes duties which entitle it to step into three sets of shoes. When, on default of the contractor, it pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of laborers and material men who have been paid by the surety – who may have had liens; and, not least, in the shoes of the government, for whom the job was completed.

*National Shawmut Bank of Boston*, 411 F.2d 843, 844-845.

The entitlement of the performing surety to priority rights to contract payments to the exclusion of a principal's assignee, even one with a perfected security interest, is well-established and should govern this case.

### *USF&G v. United Penn Bank* Does Not Support Royal Bank's Motion

Royal Bank's entire motion relies exclusively upon the Superior Court of Pennsylvania's opinion in *USF&G v. United Penn Bank*, 362 Pa. Super. 440, 524 A.2d 958 (1987), *app. den.*, 517 Pa. 609, 536 A.2d 1333 (Pa. 1987), which addresses claims by a surety that are wholly distinguishable from F&D's claims herein. A simple reading of this case shows that it does not stand for the proposition for which it is cited by Royal Bank, and further, that it is Royal Bank's

position, and not F&D's, that is "based entirely on an unsupported legal premise." In *USF&G*, a surety wrongfully attempted to extend its rights of equitable subrogation beyond the proceeds of the bonded contract in an attempt to reach its principal's inventory, which was the subject of a bank's perfected security interest.

Before even addressing whether the inventory was subject to any subrogation rights, the Superior Court noted that "it does not appear that the doctrine of equitable subrogation is applicable," in that the record was devoid of any allegation by the surety that it had paid any sums in satisfaction of the payment bond claims. *USF&G*, 524 A.2d 958, 963. Here, however, F&D has expended in excess of $500,000 in satisfaction of payment bond claims and in performance of the Contract.

The Court went on to note that *Jacobs* did not support the *USF&G* surety's contention, in that *Jacobs* only required that a performing surety "should be accorded priority in *unpaid contract proceeds*. It does not even imply that the surety be given priority in *personal property* of the defaulting contractor for such property is subject to another's perfected security interest." *Id*.

Here, F&D has not asserted a claim of entitlement to anything but the contract proceeds to which it is entitled as a matter of law under *Jacobs*. If, which is not the case, F&D was asserting an entitlement to some portion of RPSS' personal property in which F&D did not have an interest, then Royal Bank's position might have some merit. However, given the facts at hand, *USF&G* is completely inapplicable to the case herein and provides no legal basis for the dismissal of F&D's Complaint.

## RPSS' Assignment to F&D Entitles
## F&D to Priority In the Contract Proceeds

While principles of equitable subrogation are sufficient to dispose of Royal Bank's motion, independent and adequate alternative legal grounds exist for denying the motion.

In addition to its right of equitable subrogation, F&D is entitled to priority in the contract proceeds on the strength of RPSS' assignment to F&D. Pursuant to the terms and conditions of the Agreement of Indemnity, RPSS and its principals agreed, among other things, to the assignment, as collateral, of their rights under the Contract. In relevant part, the Agreement states:

ASSIGNMENT

THIRD: The Contractor, the Indemnitors hereby consenting, will assign, transfer and set over, and does hereby assign, transfer and set over to the Surety, as collateral, to secure the obligations in any and all of the paragraphs of this Agreement and any other indebtedness and liabilities of the Contractor to the Surety, whether heretofore or hereafter incurred, the assignment in the case of each contract to become effective as of the date of the bond covering such contract, but only in the event of (1) any abandonment, forfeiture or breach of any contracts referred to in the Bonds or of any breach of any said Bonds; or (2) of any breach of the provisions of any of the paragraphs of this Agreement; or (3) of a default in discharging such other indebtedness or liabilities when due; or (4) of any assignment by the contractor for the benefit of creditors, or of the appointment, or of any application for the appointment of a receiver or trustee for the Contractor whether insolvent or not. . . : (a) All of the rights of the Contractor in, and growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; (b) All the rights, title and interest of the Contractor in and to all machinery, equipment, plant, tools and materials which are now, or may hereafter be, about or upon the site or sites of any and all of the contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in the Bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of said sites; (c) All the rights, title and interest of the Contractor in and to all subcontracts let or to be let in connection with any and all contracts referred to in the Bonds, and

>in and to all surety bonds supporting such subcontracts; (d) All actions, causes of action, claims and demands whatsoever which the Contractor may have or acquire against any subcontractor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any and all contracts referred to in the Bonds, and against any surety or sureties of any subcontractor, laborer or materialman; (e) Any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest.

The Agreement of Indemnity expressly states that RPSS' assignment of contract proceeds to F&D "becomes effective as of the date of the Bond," which is February 1, 2001. This pre-dates the purported assignment to Royal Bank by nearly six months.

Royal Bank was fully aware of F&D's rights as surety on the Project, as evidenced by the August 8, 2001 "acknowledgment" letter attached hereto as Exhibit "E." In fact, that letter acknowledges the existence of the Royal Bank assignment "subject to" F&D's "rights as Surety in the event of default by" RPSS.

Accordingly, F&D is entitled to priority in the contract proceeds by operation of RPSS' assignment, in addition to its rights of equitable subrogation.

**CONCLUSION**

For all of the reasons set forth above, F&D respectfully requests that this Honorable Court deny Royal Bank's motion in its entirety, as F&D's rights in the contract balance are clearly superior to those of Royal Bank.

                                          Respectfully submitted,

                                          WOLF, BLOCK, SCHORR AND SOLIS-COHEN, LLP

                                          By:_____
                                              Scott M. Waldman
                                              1650 Arch Street, 22nd Floor
                                              Philadelphia, PA  19103
                                              (215) 977-2074

                                              *Attorney for Plaintiff,*
                                              *Fidelity and Deposit Company of Maryland*

Date:  June 7, 2002

**CERTIFICATE OF SERVICE**

I, Scott M. Waldman**,** hereby certify that today I caused a true and correct copy of the foregoing Memorandum of Law of Plaintiff Fidelity and Deposit Company of Maryland in Opposition to Defendant Royal Bank of Pennsylvania's Rule 12(b)(6) Motion to Dismiss, and exhibits thereto, to be sent via United States first class mail, postage pre-paid, as follows:

    Richard S. Hannye, Esquire
    Royal Bank of Pennsylvania
    732 Montgomery Avenue
    Narberth, PA  19072

    _____
    Scott M. Waldman

Date:   June 7, 2002

DSB:845577.1/FID024-158178