**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FIDELITY AND DEPOSIT COMPANY | : | |
| OF MARYLAND | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 02-CV-2674 |
| v. | : | |
| | : | |
| ROYAL BANK OF PENNSYLVANIA | : | |
| | : | |
| Defendant. | : | |

## <u>ORDER</u>

AND NOW, this ___ day of _____, 2002, upon consideration of plaintiff Fidelity and

Deposit Company of Maryland's Motion for Summary Judgment, and the response of defendant

Royal Bank of Pennsylvania thereto, it is hereby ORDERED and DECREED that said Motion is

GRANTED, and that judgment is entered in favor of plaintiff and against defendant in the

amount of $222,267.00, plus 6% simple annual interest thereon, accruing from February 22,

2002.

**BY THE COURT:**

_____

**EDMUND V. LUDWIG, U.S.D.J.**

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

FIDELITY AND DEPOSIT COMPANY :
OF MARYLAND : CIVIL ACTION
:
                       Plaintiff, : NO. 02-CV-2674
    v. :
:
ROYAL BANK OF PENNSYLVANIA :
:
                Defendant. :

**MOTION FOR SUMMARY JUDGMENT OF**
**PLAINTIFF, FIDELITY AND DEPOSIT COMPANY OF MARYLAND**

Pursuant to Fed.R.Civ.P. 56, plaintiff, Fidelity and Deposit Company of Maryland, hereby moves this Honorable Court for summary judgment on all counts of its Complaint against defendant, Royal Bank of Pennsylvania.  The reasons in support of plaintiff's motion are fully set forth in the accompanying Memorandum of Law.

Respectfully submitted,

WOLF, BLOCK, SCHORR AND SOLIS-COHEN, LLP

By: _____
     Scott M. Waldman
     1650 Arch Street, 22nd Floor
     Philadelphia, PA  19103
     (215) 977-2074

     *Attorney for Plaintiff,*
     *Fidelity and Deposit Company of Maryland*

Date:  November 27, 2002

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FIDELITY AND DEPOSIT COMPANY | : | |
| OF MARYLAND | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 02-CV-2674 |
| v. | : | |
| | : | |
| ROYAL BANK OF PENNSYLVANIA | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF FIDELITY AND DEPOSIT COMPANY OF**
**MARYLAND'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Fidelity and Deposit Company of Maryland ("F&D"), by and through its

undersigned counsel, hereby submits this Memorandum of Law in support of its Motion for

Summary Judgment herein.

## I.  FACTUAL BACKGROUND

On February 22, 2001, Restoration & Preservation Systems & Services, Inc. ("RPSS")

entered into a contract with the Commonwealth of Pennsylvania, Department of General

Services, to perform general construction, and window and brick replacement at the State

Correctional Institution at Graterford, Montgomery County, Pennsylvania ("Project").  *See* Joint

Stipulation of Facts (hereinafter "Stipulated Record" or "SR"), ¶ 5.  A true and correct copy of

the Contract between RPSS and the Commonwealth for the Project is attached to the Stipulated

Record as Exhibit "B."

Pursuant to both the Contract and the Pennsylvania Public Works Contractor's Bond Law

of 1967, 8 P.S. § 191, *et seq.*, RPSS was required to secure its payment and performance

obligations on the Project with a bond.  At RPSS's request, F&D issued Contract Bond No. PRF

851 8739 ("Bond") (*SR*, Ex. "C") in the penal sum of $1,748,000.00 on February 1, 2001.  *SR,* ¶ 6.

As an inducement for F&D's issuance of the Bond, RPSS, along with its principals acting in their individual capacity, executed an Agreement of Indemnity (*SR*, Ex. "A"), which granted rights to F&D, including, but not limited to, an assignment of all of RPSS's rights in the proceeds of the Contract "to become effective as of the date of the Bond" in the event of RPSS's breach of the Contract.  *SR*, ¶ 4.

Approximately six months after the execution of the Indemnity Agreement and issuance of the Bond, RPSS executed an Assignment of Claims in favor of Royal Bank in connection with a purported non-revolving SBA loan in the amount of $522,100.00.  *SR*, ¶¶ 7, 8, Ex. "D."  Prior to closing on its loan to RPSS, Royal Bank, in awareness of F&D's role as surety in connection with the Project, sought from F&D an acknowledgment of the existence of RPSS's Assignment of Claims to Royal Bank.  *SR*, ¶ 11.  By letter of August 8, 2001, F&D acknowledged the existence of the Assignment of Claims "subject to [F&D's] rights as surety in the event of a default" by RPSS on the Project.  *SR*, ¶ 11, Ex. "F."

On September 10, 2001, Royal Bank Vice President Dave Lockner prepared a memorandum stating that he had "mistakenly" denoted the Loan as "non-revolving," and sought to address his "error" by having the Loan converted to a "revolving" line of credit.  *SR*, ¶ 12, Ex. "G."  Sometime during the next three days, the Loan was so converted.  *SR*, ¶ 13.  However, Royal Bank failed to advise either F&D or the Commonwealth of this significant event.  *SR*, ¶ 15.

Beginning in January, 2002, and continuing through the present, F&D received numerous notifications of claims from various subcontractors of RPSS on the Project that they had not

received payment from RPSS for work performed on that Project. *SR*, ¶¶ 17, 18, 20. The first indication of trouble on the Project came in the form of a January 18, 2002 letter from Hope's Windows, Inc., a subcontractor of RPSS on the Project, submitting a claim against the Bond for unpaid invoices on labor and material provided as of November 26, 2001. *SR*, ¶ 17, Ex. "I." On January 22, 2001, another RPSS subcontractor, Hawk Construction Products, Inc., wrote to the Commonwealth about unpaid invoices dating back to October 26, 2001. *SR*, ¶ 18, Ex. "J." The Commonwealth responded via letter of January 28, 2002, a copy of which was sent to Royal Bank, advising Hawk to submit a payment bond claim to F&D. *SR*, ¶ 19, Ex. "K." The Commonwealth also wrote to RPSS on that day, with a copy to Royal Bank, admonishing RPSS to perform its obligation of paying its subcontractor, as required by the Contract. *SR*, ¶ 19, Ex. "K." Accordingly, as early as January, 2001, Royal Bank had actual notice of RPSS's default under the Contract, as well as actual notice of the Bond Claims submitted to F&D.

On February 11, 2002, F&D wrote to the Commonwealth advising of F&D's receipt of various payment bond claims and of F&D's entitlement to the Project funds. *SR*, ¶ 22, Ex "L." Then, on February 14, 2002, the undersigned spoke via telephone with a Royal Bank employee familiar with the Loan, and advised him of F&D's entitlement to the Project funds.[1] This telephone conversation was confirmed via copy of the undersigned's February 15, 2002 letter to the Commonwealth. *SR*, ¶ 23, Ex. "M." That same day, in recognition of the existence of F&D's claim and in an obvious attempt to thwart F&D's recovery efforts, Royal Bank Vice President Jim McSwiggan issued an internal Memorandum regarding the Loan, advising that "no

---

[1] Royal Bank's counsel has advised the undersigned that the individual with whom the undersigned spoke on February 14, 2002 is no longer a bank employee. Due to Royal Bank's counsel's stated inability to independently confirm the occurrence of the subject conversation, it is not included in the Stipulated Record. However, subject to the obligations and penalties of Fed.R.Civ.P. 11, the undersigned verifies this fact and submits it for the Court's consideration.

further advances under any circumstances are permitted," and directing, in bold-faced, all capital print that:

> ANY CHECKS RECEIVED FROM THE COMMONWEALTH OF PENNSYLVANIA IN CONNECTION WITH THIS LOAN SHOULD BE DEPOSITED WITHIN 30 SECONDS AND IN A MANNER TO EXPEDITE COLLECTION AS QUICKLY AS POSSIBLE.

*SR*, ¶ 24, Ex. "N."

On or about February 15, 2002, the Commonwealth issued its check no. 8138862 in the amount of $222,267.00 ("Funds") to Royal Bank as assignee of RPSS's right to receive progress payments in the Project.  *SR*, ¶ 25, Ex. "O."  This check was deposited by Royal Bank on February 22, 2002.  *SR*, ¶ 25.

On or about March 7, 2002, RPSS irrevocably and voluntarily abandoned and terminated its work on the Project, triggering F&D's performance obligations under the Bond.  *SR*, ¶ 27.  To date, F&D has paid in excess of $500,000.00 in satisfaction of the aforesaid subcontractor claims, and in performance of the Project itself, exclusive of F&D's own expenses.  *SR*, ¶ 21.  Despite F&D's repeated requests for Royal Bank to tender the Funds, Royal Bank continues to retain the Funds.  *SR*, ¶¶ 29-30.

On May 3, 2002, F&D instituted the above-captioned action against Royal Bank to recover the Funds, based upon Royal Bank's conversion, unjust enrichment and tortious interference with contract.  Each of the three separate grounds for recovery are based upon the sole legal issue that is at the root of the dispute between F&D and Royal Bank:  whether F&D, as a performing surety, has priority in the Contract proceeds over Royal Bank, even though Royal Bank filed Financing Statements prior to RPSS's default in the Project.  As set forth below, Pennsylvania law mandates priority of F&D's interest in the Contract proceeds, and Royal Bank must therefore tender the Funds, with interest, to F&D.

## II. <u>ARGUMENT</u>

### A.     <u>Introduction</u>

F&D's claims are based upon its rights of equitable subrogation, as well as the assignment rights provided in the Agreement of Indemnity.  A surety's equitable subrogation rights trump the rights of a secured contract assignee, even where the surety is also the beneficiary of an express assignment.  *See Pearlman v. Reliance Insurance Co.,* 371 U.S. 132 (1962); *Jacobs v. Northeastern Corp.*, 416 Pa. 417, 206 A.2d 49 (1965); R. Hillman, J. McDonnell and S. Nickles, *Common Law and Equity Under the Uniform Commercial Code* (1985), ¶ 24.01[2][a][i, ii].

Moreover, the law plainly provides that a surety has the right to receive contract funds that were earned, but remained unpaid prior to default.  *See National Shawmut Bank of Boston v. New Amsterdam Casualty Co.,* 411 F.2d 843, 848 (1st Cir. 1969).  This right is based upon the surety's succession to the owner's right to withhold otherwise earned payments in order to rectify a default.  *Id.*

Further, a surety is entitled to recover money paid by the owner to an assignee, where, as here, a surety can "prove that the assignee had knowledge of the contractor's breach or, in some cases, that the assignee actually knew of this breach and also of the surety's claim to the funds." *Common Law and Equity*, ¶ 24.01[2][b][ii], p. 24-21.

In addition to the longstanding common law support for F&D's priority in the Funds, there exist separate and independent grounds compelling the disgorgement of the Funds.  The Agreement of Indemnity executed by RPSS in favor of F&D prior to the Loan by Royal Bank assigns RPSS' rights under the Contract to F&D as collateral for the Bond undertaking, with such assignment relating back to the date of its execution upon RPSS' default.  Moreover, Royal Bank's secret conversion of the Loan from a "non-revolving" to a "revolving" credit facility

greatly prejudiced F&D, which had relied upon the Loan's "non-revolving" feature as a cap to the liability that RPSS could incur on the Loan.  To allow Royal Bank to profit from its deliberate failure to disclose this critical change would be patently unjust.

**B.** **Legal Standard**

"The Federal Rules of Civil Procedure have for [more than] 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corporation v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555 (1986). Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986) citing Fed.R. Civ. P. 56(c).  *See also Huang v. BP Amoco Corp.*, 271 F.3d 560, 564 (3d Cir. 2001).

The parties have agreed to and filed a Stipulated Record herein, setting forth the facts upon which this matter is based, leaving only a question of law to be decided by the Court: Under these facts, which party has priority in the Funds?  As set forth below, the answer, as a matter of law, is that F&D's common law surety rights compel F&D's priority in the Funds, irrespective of any rights that Royal Bank may assert under the Uniform Commercial Code or otherwise.

**C.    F&D's Right of Equitable Subrogation Entitles
It to Priority in the Remaining Contract Balance**

**1.    A Surety's Equitable Subrogation Rights Are
Not "Security Interests" Subject to UCC Article 9**

F&D bonded RPSS's performance and payment obligations on the Project as required by

the Contract, which requires RPSS to submit

> a Contract Bond, or Bonds, on the form provided by the
> Department, in the penal sum equal to the amount of the awarded
> Contract, for the faithful performance of the Contract, and to cover
> the prompt payment in full for all materials furnished and labor
> supplied or performed and equipment actually rented.

*Contract, Instruction to Bidders*, A.33, *SR*, Ex. "B."

The Contract, which not only requires the Bonds, but incorporates them therein

(*Contract, Standard Form*, 9.3), does so pursuant to the Pennsylvania Public Works Contractor's

Bond Law of 1967, 8 P.S. § 191, *et seq.*, which provides, in pertinent part:

> **§ 193.  Bonds required; types; sureties; filing**
>
> (a)  Before any contract exceeding five thousand dollars
> ($5,000) for the construction, reconstruction, alteration or repair of
> any public building or other public work or public improvement,
> including highway work, of any contracting body is awarded to
> any prime contractor, such contractor shall furnish to the
> contracting body the following bonds, which shall become binding
> upon the awarding of said contract to such contractor:
>
> (1) A performance bond at one hundred percent of the contract
> amount, conditioned upon the faithful performance of the contract
> in accordance with the plans, specifications and conditions of the
> contract.  Such bond shall be solely for the protection of the
> contracting body which awarded the contract.
>
> (2) A payment bond at one hundred percent of the contract
> amount.  Such bond shall be solely for the protection of claimants
> supplying labor or materials to the prime contractor to whom the
> contract was awarded, or to any of his subcontractors, in the
> prosecution of the work provided for in such contract, and shall be
> conditioned for the prompt payment of all such material furnished
> or labor supplied or performed in the prosecution of the work.

"Labor or materials" shall include public utility services and
reasonable rentals of equipment, but only for periods when the
equipment rented is actually used at the site.

The seminal case determining that a performing surety is entitled to receive the remaining

balance on a bonded contract ahead of other creditors is *Pearlman v. Reliance Insurance*

*Company*, 371 U.S. 132 (1962).  There, the Supreme Court noted that "there are few doctrines

better established than that a surety who pays the debt of another is entitled to all the rights of the

person he paid to enforce his right to be reimbursed.  This rule, widely applied in this country [is]

generally known as the right of subrogation."  *Pearlman*, 371 U.S. 132, 136-137.  The Court

went on to hold that the surety that satisfies payment bond claims of its principal's

subcontractors becomes entitled through subrogation to remaining contract proceeds in the

project owner's possession, and that the surety that expends funds in excess of the remaining

contract balance, "has a right to all of it."  *Pearlman*, 371 U.S. at 142.  *Pearlman* dealt with a

contractor whose work on a federal project was governed by the Miller Act.

The Pennsylvania Bond Law is virtually identical to the federal Miller Act, and both the

federal and state courts in Pennsylvania have noted that "decisions of the federal court in Miller

Act cases have been helpful in determining the proper construction of the state bonding law."

*Nicholson Construction Company v. The Standard Fire Insurance Company*, 760 F.2d 74, 77 (3rd

Cir. 1985) *citing Commonwealth v. National Union Fire Insurance Company*, 434 Pa. 235, 252,

A.2d 593 (1969) and *Jacobs v. Northeastern Corp.*, 416 Pa. 417, 206 A.2d 49 (1965).

In *Jacobs v. Northeastern Corporation*, 416 Pa. 417, 206 A.2d 49 (1965), the Supreme

Court of Pennsylvania adopted *Pearlman* in deciding a case with issues similar to those herein.

In *Jacobs*, the bonded principal was placed in receivership and its sureties were called upon to

satisfy various payment bond claims.  The principal's receiver opposed the sureties' requests for

the remaining contract balance, contending that they only held the status of general unsecured

creditors.  In holding that the sureties were entitled to priority in receipt of the contract funds, the

*Jacobs* Court noted that had "the surety not paid the labor and materialmen, the funds held by the

Commonwealth agencies would not have been available to the general creditors.  Since the

sureties stand in the places of those whose claims they have paid, as persuasively pointed out in

*Pearlman*, the funds must be paid to the sureties, just as the funds would have gone, in the

absence of a bond, to the labor and materialmen rather than to the general creditors."  *Jacobs v.*

*Northeastern Corp.*, 206 A.2d 49, 54.  In *Jacobs*, the receiver unsuccessfully argued, as does

Royal Bank herein, that because the sureties did not file financing statements, their

"unperfected" security interests could not prevail over other creditors.  In the words of the

*Jacobs* Court:

> The issue simply is:  Were they required to do so?  We hold that
> they were not.
>
> None of the purposes or objectives of the Code's filing
> requirements would be served by holding that the subrogation to
> the contract balance now due is an assertion of a 'security interest'
> and therefore subject to the filing provisions of Article 9.  The
> contract balance withheld would never have become due and
> payable to [principal] (or its receiver or creditors) as long as
> [principal] defaulted on its obligation to pay labor and
> materialmen.  Payment of the retained balance became due and
> available *only* upon performance by the sureties of [principal's]
> obligations. . . .
>
> Of basic importance is the general rule of Section 9-102(2) that
> Article 9 'applies to security interest *created by contract.'*  Rights
> of subrogation, although growing out of a contractual setting and
> oft times articulated by the contract, do not depend for their
> existence on a grant in the contract, but are created by law to avoid
> injustice.  **Therefore, subrogation rights are not 'security
> interests' within the meaning of Article 9.  The sureties' rights
> of subrogation, having been created by operation of law, are
> not the usual type of consensual security interests
> contemplated by the Code.**

*Jacobs*, 206 A.2d at 55 (bold emphasis added).

In *Himes v. Cameron County Construction Corp.*, 289 Pa. Super 143, 432 A.2d 1092 (1991), *aff'd.* 497 Pa. 637, 444 A.2d 98 (1982), a bank claimed priority in unpaid contract funds, based upon the bank's filing of UCC filing statements referencing an assignment and security interest granted by the contractor in the proceeds of the bonded construction contract. At the project's conclusion, an unpaid supplier sought payment from the remaining contract funds, to which the bank claimed a priority interest. However, in *Himes*, as here,[2] the bank's assignment provided that the bank only became entitled to contract funds due or to become due, since the contractor cannot assign greater rights than it actually holds. The *Himes* Court held "that the Bank never gained any rights to the disputed fund in the instant case because the Contractor never attained such rights [due to its default]. Thus, the Bank has no security interest whatsoever on which to base its claim." *Himes*, 432 A.2d 1092, 1097.

*Jacobs'* and *Himes'* rejection of the argument that subrogation rights are Article 9 security interests is neither novel nor limited to Pennsylvania. For instance, in *Transamerica Insurance Company v. Barnett Bank of Marion County*, 540 So. 2d 113 (Fla. 1989), the Supreme Court of Florida held that a surety's equitable subrogation rights had priority over a bank's perfected security interests in contract proceeds, and stated:

> The overwhelming and essentially unanimous post-U.C.C. decisions in this country, federal as well as state courts, have held that (1) the surety's equitable right of subrogation is not a consensual security interest, (2) no U.C.C. filing is necessary to perfect the surety's interest, and (3) the surety's interest continues to be, as it was under pre-Code law, superior to the claim of a contract assignee, such as a bank.

*Transamerica Insurance Company*, 540 So. 2d 113, 117, citing *National Shawmut Bank v. New Amsterdam Casualty Co.,* 411 F.2d 843 (1st Cir. 1969); *In re J.V. Gleason Co.,* 452 F.2d 1219

---

[2]    RPSS' Assignment of Claims to Royal Bank covers "all moneys and claims for moneys due or to become due to" RPSS under its Contract with the Commonwealth. *SR,* Ex. "D."

(8th Cir. 1971); *Home Indem. Co. v. United States,* 193 Ct. Cl. 266, 433 F.2d 764 (1970); *First*

*Alabama Bank v. Hartford Accident & Indem. Co.,* 430 F.Supp. 907 (N.D. Ala. 1977); *Third*

*Nat'l Bank v. Highlands Ins. Co.,* 603 S.W.2d 730 (Tenn. 1980); *Alaska State Bank v. General*

*Ins. Co.,* 579 P.2d 1362 (Alaska 1978); *Argonaut Ins. Co. v. C & S Bank*, 140 Ga.App. 807, 232

S.E.2d 135 (1976); *Financial Co. of America v. United States Fidelity & Guar. Co.*, 277 Md.

177, 353 A.2d 249 (1976); *Canter v. Schlager*, 358 Mass. 789, 267 N.E.2d 492 (1971); *United*

*States Fidelity & Guar. Co. v. First State Bank,* 208 Kan. 738, 494 P.2d 1149 (1972); *Travelers*

*Indem. Co. v. Clark*, 254 So.2d 741 (Miss. 1971); *Jacobs v. Northeastern Corp.*, 416 Pa. 417,

206 A.2d 49 (1965); *White & Summers,* Uniform Commercial Code § 22-5 (2d Ed. 1980).

The *Transamerica* case was cited with approval by the Third Circuit in *First Indemnity of*

*America Insurance Company v. Modular Structures, Inc.*, 27 F.3d 72 (3rd Cir. 1994).  There, in

applying New Jersey law, the Court held that because a defaulting contractor was not "owed"

contract funds held by a project owner, they were not subject to a bank's "superpriority lien," but

rather belonged to the performing surety.  *First Indemnity of America Insurance Company*, 27

F.3d 72, 80 (3rd Cir. 1994).

### 2.    A Performing Surety Has Priority In Earned, but Unpaid, Contract Proceeds

Here, the failures by RPSS to pay its subcontractors entitled the Commonwealth to

withhold the payment of Contract proceeds to RPSS.  The Contract provides that "it is within the

Department's discretion to withhold payment because of the Contractor's failure to pay

subcontractors or suppliers."  *Contract*, 11.6(7); *SR*, Ex. "B."  The Contract further provides that

the Commonwealth may withhold payment upon "reasonable indication that the work will not be

completed within the contract time" or "unsatisfactory prosecution of the work by the

Contractor."  *Contract*, 11.6(5), (6); *SR*, Ex. "B."  The first few payment bond claims submitted

to F&D referenced failures by RPSS to pay its invoices as early as October and November, 2001. *SR*, ¶¶ 17, 18, Ex. "I," "J." These failures pre-date by several months RPSS' submission of the payment application upon which the Commonwealth's release of the Funds was based. *SR*, ¶ 16, Ex. "H."

Just as the contractor in *Himes* had no right to the remaining contract balance, and thus possessed no right to assign, RPSS had no entitlement to the Funds, and as such, could not assign such rights to Royal Bank. Moreover, it has been expressly held that a surety's priority in remaining contract funds does not apply only to remaining balances or retainage, but is "equally as applicable to progress payments." *Ram Construction*, 32 B.R. at 761.

In yet another virtually identical case, the First Circuit noted in *National Shawmut Bank of Boston v. New Amsterdam Casualty Co., Inc.,* 411 F.2d 843, 849 (1st Cir. 1969), that "equitable subrogation is too hardy a plant to be uprooted by a Code which speaks around but not to the issue," and held that a performing surety had priority in earned, but unpaid, contract proceeds over a secured bank. In a statement equally applicable to this case, the *National Shawmut* Court explained equitable subrogation as follows:

> In this case there is confusion because the tendency is to think of the surety on Miller Act payment and performance bonds as standing in the shoes only of the entity it 'insures' – the contractor. So long as this one-dimensional concept prevails, logic compels the surety to be assessed as merely one of the contractor's creditors, and to be subject to the system of priorities rationalized by the Uniform Commercial Code. But the surety in cases like this undertakes duties which entitle it to step into three sets of shoes. When, on default of the contractor, it pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of laborers and material men who have been paid by the surety – who may have had liens; and, not least, in the shoes of the government, for whom the job was completed.

*National Shawmut Bank of Boston*, 411 F.2d 843, 844-845.

**3.    A Performing Surety Is Entitled to Recover Contract Funds
from an Assignee with Prior Knowledge of the Surety' Claim**

It is well-established that where, as here, a surety can "prove that the assignee had
knowledge of the contractor's breach or, in some cases, that the assignee actually knew of this
breach and also of the surety's claim to the funds," the surety is entitled to recover contract funds
that have already been paid to the assignee.  R. Hillman, J. McDonnell and S. Nickles, *Common
Law and Equity Under the Uniform Commercial Code*, (1985), ¶ 24.01[2][b][ii], p. 24-21, *citing
California Bank v. USF&G Co.*, 129 F.2d 751 (9th Cir. 1942); *USF&G Co. v. Bank of Brewton,* 4
F.Supp. 272 (S.D. Ala. 1933); *Aetna Casualty & Surety Co. v. Harvard Trust Co.*, 344 Mass.
160, 181 N.E.2d 673 (1962); *Maryland Casualty Co. v. National Bank of Germantown & Trust
Co.*, 320 Pa. 129, 182 A. 362 (1936).

Here, the Stipulated Record clearly supports a finding that Royal knew about RPSS'
breach and F&D's claim to the Funds.  *SR,* Ex. "K" (1/28/02 letters from Commonwealth
regarding of RPSS' failure to pay Hawk's invoices) and Ex. "M" (2/15/02 letter from
undersigned regarding RPSS' defaults and F&D's claim to Funds).  Royal Bank cannot deny
actual knowledge of either RPSS' default or of F&D's claim for the Project funds.  Most telling
is Royal Bank's February 15, 2002 memorandum issued one day after the undersigned's
telephone conversation with a Royal Bank employee advising of F&D's claim to the Funds and
all remaining contract proceeds.  *SR,* ¶ 24.  This memorandum not only placed the Loan "on non-
accrual status," barred "further advances under any circumstances" and froze all other accounts
of RPSS and its principal shareholder, but it also required the deposit "within 30 seconds" of all
Commonwealth checks.  *SR,* Ex. "N."  The inference here speaks for itself.

The entitlement of the performing[3] surety to priority rights to contract payments to the exclusion of a principal's assignee, even one with a perfected security interest, is well-established and requires that Royal Bank tender the Funds to F&D.

**D.     RPSS' Assignment to F&D Entitles
F&D to Priority In the Contract Proceeds**

While principles of equitable subrogation are sufficient to dispose of Royal Bank's motion, independent and adequate alternative legal grounds exist for granting summary judgment to F&D.

In addition to its right of equitable subrogation, F&D is entitled to priority in the contract proceeds on the strength of RPSS' assignment to F&D. Pursuant to the terms and conditions of the Agreement of Indemnity, RPSS and its principals agreed, among other things, to the assignment, as collateral, of their rights under the Contract. In relevant part, the Agreement states:

ASSIGNMENT

THIRD: The Contractor, the Indemnitors hereby consenting, will assign, transfer and set over, and does hereby assign, transfer and set over to the Surety, as collateral, to secure the obligations in any and all of the paragraphs of this Agreement and any other

---

[3]     F&D anticipates that Royal Bank may attempt to argue that F&D's subrogation rights did not vest until RPSS formally abandoned the Project on March 7, 2002. "Whether a formal default has been declared is arguing about angels on the head of a pin." *Ram Construction Company, Inc. v. American States Insurance Company*, 32 B.R. 758, 760 (W.D.Pa 1983), *aff'd.* 749 F. 2d 1049 (3d Cir. 1984). Moreover, the January subcontractor claims based upon the October and November, 2001 failures of RPSS triggered F&D's payment obligations, while RPSS' March abandonment triggered F&D's performance obligations under the Bond.

All that is necessary for the surety to prevail is that the contractor be in default as a matter of fact; or that as a result of such default, the surety has become obligated to pay under its . . . payment or performance bond. No formal declaration of default is required.

*Royal Indemnity Co. v. United States*, 178 Ct. Cl. 46, 371 F. 2d 462, 464 (1967).

indebtedness and liabilities of the Contractor to the  Surety, whether heretofore or hereafter incurred, the assignment in the case of each contract to become effective as of the date of the bond covering such contract, but only in the event of (1) any abandonment, forfeiture or breach of any contracts referred to in the Bonds or of any breach of any said Bonds; or (2) of any breach of the provisions of any of the paragraphs of this Agreement; or (3) of a default in discharging such other indebtedness or liabilities when due; or (4) of any assignment by the contractor for the benefit of creditors, or of the appointment, or of any application for the appointment of a receiver or trustee for the Contractor whether insolvent or not. . . : (a) All of the rights of the Contractor in, and growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; (b) All the rights, title and interest of the Contractor in and to all machinery, equipment, plant, tools and materials which are now, or may hereafter be, about or upon the site or sites of any and all of the contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in the Bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of said sites; (c) All the rights, title and interest of the Contractor in and to all subcontracts let or to be let in connection with any and all contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts; (d) All actions, causes of action, claims and demands whatsoever which the Contractor may have or acquire against any subcontractor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any and all contracts referred to in the Bonds, and against any surety or sureties of any subcontractor, laborer or materialman; (e) Any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest.

The Agreement of Indemnity expressly states that RPSS' assignment of contract proceeds to F&D "becomes effective as of the date of the Bond," which is February 1, 2001. *SR*, Ex. "A." This pre-dates the purported Assignment to Royal Bank by nearly six months.

As a matter of law, "creditors are bound to know of the substantive law requiring the filing of bonds and the possible claims of sureties in the event of defaults by contractors."

*Jacobs v. Northeastern Corporation*, 416 Pa. 417, 206 A.2d 49, 55 (1965).  Additionally, prior to

filing its Financing Statement, Royal Bank had actual and constructive notice both of F&D's

participation in RPSS' project and of F&D's rights in the event of default by F&D, as evidenced

by F&D's August 8, 2001 letter, which expressly conditions the acknowledgment "subject to"

F&D's "rights as surety in the event of default by" RPSS.  *SR,* Ex. "F."

Despite such actual and imputed knowledge, Royal Bank continues to wrongfully detain

the Funds.  Accordingly, F&D is entitled to priority in the contract proceeds by operation of

RPSS' assignment, in addition to its rights of equitable subrogation.

**E.      Even Assuming that F&D Agreed to Subordinate Its
          Position to Royal Bank's, the Change in Loan
          Terms/Amount Compels the Payment of the Funds to F&D**

Royal Bank does not deny that its initial loan of funds to RPSS was on a "revolving"

basis, as reflected throughout the Stipulated Record.  It was on this basis that F&D issued its

acknowledgement letter of August 8, 2001 (*SR*, Ex. "F").  As early as September 10, 2001, Royal

Bank knew of its "error" in "mistakenly" creating a non-revolving facility, and accordingly

converted the facility to "revolving."  *SR* ¶ 12, Ex. "G".  However, Royal Bank failed to so

advise either F&D or the Commonwealth of this significant and material change.  *SR,* ¶ 15.

F&D's "acknowledgment" of the loan, which was subject to its rights as surety in the

event of default, was based upon Royal Bank's representation that the loan was "non-revolving,"

*i.e.,* fixed at a maximum of $522,100 that would be advanced to RPSS.  Over the course of a

$1.748 million contract, this amount of principal could easily be repaid in the earlier stages of the

job, and was therefore not of a major concern to F&D.  However, a revolving credit facility has

much different implications in such a situation.  Under a revolving facility, the borrower's

obligation can continue throughout the entirety of the project and the borrower may ultimately

owe and pay multiples of the credit limit.  Such a facility prejudices other creditors, such as

F&D, who expect the majority of the contract proceeds to be free from any potential claimants.

Royal Bank has advanced $1,614,834.60 to RPSS, and RPSS has repaid $1,212,291.60 to

Royal Bank (not including the $222,267 at issue herein)  *SR,* Ex. "P."  Accordingly, Royal Bank

advanced $1,092,734.60 more than the $522,100 as to which it advised F&D, and RPSS paid

$690,191.60 more than the maximum that F&D expected.  The loan, as it was originally

represented to F&D, was almost fully repaid as of November 5, 2001, and was overpaid by

$193,186.59 with RPSS' next payment on November 29, 2001.  *SR,* Ex. "P."

Putting aside all issues of surety law, which clearly dictate that F&D prevail in this

matter, Royal Bank's best possible argument is that F&D agreed to subordinate itself to Royal

Bank's position for the full amount of the $522,100 non-revolving Loan.  While this is, of

course, denied by F&D, and only assuming its truth *arguendo*, then F&D essentially agreed to

forfeit its right to the first $522,100 of Contract proceeds.  However, rather than correcting its

representation of the nature of the loan to either F&D or the Commonwealth, Royal Bank chose

to remain silent as to its "mistake" and the subsequent material change to the Loan.  Under Royal

Bank's own best case scenario, its priority over F&D expired in November, 2001 upon RPSS'

repayment of the first $522,100.  The fact is that Royal Bank has already collected $1.2 million

from RPSS, which is almost $700,000 more than the amount to which F&D allegedly agreed.

Moreover, Royal Bank appears to be trying to achieve a double recovery at F&D's expense,

given that Royal Bank is the beneficiary of a guarantee issued by the Small Business

Administration for 75% of the amounts loaned to RPSS.  There is simply no basis for Royal

Bank to expect to retain the Funds.

Royal Bank's decision to lend three times the amount of the non-revolving loan principal, and its remaining exposure for $404,794.65, should not be borne by F&D. This is particularly true in light of the result compelled by the applicable case law, as set forth in discussion above.

**F.   F&D is Entitled to Receive Delay Damages
       Arising Out of Royal Bank's Detention of the Funds**

The U.S. Court of Appeals for the Third Circuit "has held that Pennsylvania law affords a plaintiff damages for delay for 'wrongful detention' of money." *Lexington Insurance Company v. The Abington Co.,* 621 F. Supp. 18, 20 (E.D. Pa. 1985), *citing Peterson v. Crown Financial Corp.,* 661 F. 2d 287 (3rd Cir. 1981).  Here, each of the three causes of action asserted by F&D against Royal Bank arise out of the same alleged wrongful conduct:  Royal Bank's improper receipt of and continuing refusal to tender the Funds.  Royal Bank's deprivation of F&D's use of the Funds since February 22, 2002 is as much a component of F&D's claim as its entitlement to the Funds *per se*.  Any remedy that does not recognize this element of damages would be incomplete.

"The Third Circuit has held that these common law damages for delay are measured by reference to the statutory rate of interest." *Lexington Insurance Company*, 621 F. Supp. at 20, *citing American Enka Co.v. Wicaco Machine Corp*., 686 F. 2d 1050 (3rd Cir. 1982).  Under Pennsylvania law, statutory interest is to be computed at a simple annual rate of 6%.  41 Pa. Cons. Stat. Ann. § 202.

Accordingly, F&D respectfully submits that this Court should include an award of 6% simple interest along with the return of the Funds.

### III.  <u>CONCLUSION</u>

For all of the reasons set forth above, F&D respectfully requests that this Honorable

Court grant its Motion for Summary Judgment and enter judgment in favor of F&D and against

Royal Bank as set forth in the attached form of Order, as F&D's rights in the Funds are clearly

superior to those of Royal Bank.

Respectfully submitted,

WOLF, BLOCK, SCHORR AND SOLIS-COHEN, LLP


By:_____
Scott M. Waldman
1650 Arch Street, 22nd Floor
Philadelphia, PA  19103
(215) 977-2074

*Attorney for Plaintiff,*
*Fidelity and Deposit Company of Maryland*

Date:  November 27, 2002

## <u>CERTIFICATE OF SERVICE</u>

I, Scott M. Waldman, hereby certify that today I caused a true and correct copy of the foregoing Motion for Summary Judgment of Plaintiff, Fidelity and Deposit Company of Maryland, and accompanying Memorandum of Law, to be sent via United States first class mail, postage pre-paid, as follows:

Richard S. Hannye, Esquire
Royal Bank of Pennsylvania
732 Montgomery Avenue
Narberth, PA  19072


_____
Scott M. Waldman

Date:   November 27, 2002