IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FIDELITY AND DEPOSIT CO. OF MARYLAND** | : | CIVIL ACITON |
| | : | |
| v. | : | No. 02-2674 |
| | : | |
| **ROYAL BANK OF PENNSYLVANIA** | : | |

**DEFENDANT, ROYAL BANK OF PENNSYLVANIA'S BRIEF IN OPPOSITION TO PLAINTIFF, FIDELITY AND DEPOSIT CO. OF MARYLAND'S MOTION FOR SUMMARY JUDGMENT**

**I.   ARGUMENT**

    A.    <u>**Royal Did Not Have Actual Knowledge That Restoration Was In Default on August 22, 2002, When it Deposited the Commonwealth's $222,267.00 Progress Payment, And Therefore, Fidelity's Motion For Summary Judgment Must Be Denied.**</u>

In support of it's motion for Summary Judgment Fidelity repeatedly cites Robert A. Hillman, et al, Common Law and Equity Under the Uniform Commercial Code ¶ 24.01 [2] [b] (1985) (hereinafter "treatise"). However, this treatise actually supports Royal's motion for summary judgment, stating:

"**[i]   Section 9-318(1) Is No Exception to the Restitution Rule Generally Prohibiting Recovery of Payments.**  Occasionally, when a contractor defaults under a construction contract, a performing surety seeks restitution of contract payments paid to an assignee of the contractor's accounts. The argument for recovery is that as subrogee of the owner's rights against the contractor, the surety is entitled to the payments made by the owner to the assignee. A fundamental flaw in this argument is that the owner himself generally has no right to recover these payments.[54] The law of restitution provides that "an assignee of a non-negotiable chose in action who, having paid value therefore, has received payment from the obligor is under no duty to make restitution although the obligor has a defense thereto, if the transferee made no misrepresentation and did not have notice of the defense.". . . Section 9-318(1) does not displace or change this general rule so as to make an assignee affirmatively liable for the obligor's claims against the assignor.[73]

**[ii]  How the Subrogation Law Generally Works Against the Surety.**  Another hurdle in the path of a performing construction surety who, as subrogee to the owner's rights, seeks restitution of contract payments received by the assignee of the contractor's rights against the owner, is the doctrine of subrogation, which generally denies the surety payments made before the contractor's default.  The right to subrogation exists from the date the surety bond is executed, but the surety is not actually subrogated to anyone's rights until it performs.  Thus, the surety has no valid claim to any money paid before the time of its subrogation, which is the time of its performance after the contractor's default.[74]

**[iii]  Relying on an Express Assignment.**  Because of all these obstacles to recovery under the doctrine of subrogation, a surety may well abandon a restitution theory in seeking to recover contract payments made to the contractor's assignee and rely instead on an express assignment to the surety of the contractor's right to these payments.  Such an assignment often appears in the bond application that a contractor completes as a condition to obtaining the surety's guarantee of the contractor's performance.  This different theory of express assignment was of no help to the surety in most pre-Code cases.  The later assignee usually is the contractor's financer, who typically is unaware of the prior assignment of surety.  Thus, the surety lost under the common-law rule that "a subsequent assignee is entitled to retain assigned money which it receives without notice of a prior assignment."[82]

The result could be different today.  If Article 9 governs the contractor's express assignment to the surety of his rights under the construction contract,[83] the surety acquires a security interest in the account.  The priority of this interest in relation to the security interest of the contractor's financer in the same collateral will ordinarily be determined by Section 9-312(5).[84]  This provision would rank the surety's interest above the financer's if the surety filed or perfected first.[85]"

Fidelity ignores the treatise's generally negative commentary on its cause of action, relying instead on a partial sentence excerpted from the following paragraph:

"However, even though a performing surety may have an equitable claim to post-breach payments made to the contractor's assignee, the surety on this basis ordinarily cannot recover them.  One

2

court characterized the surety's equitable claim as a "latent equity" of which a good-faith assignee for value and without notice takes free.[77] The surety's rights based on restitution are not properly classified, however, as latent equities;[78] and the Restatement (Second) of Contracts provides that its rule that protects an assignee from equitable liens and the like does not give priority to an assignee over the assignor's surety who is subrogated to the rights of the obligor.[79] The courts nevertheless have applied a similar rule in cases where a surety seeks to recover post-breach payments made to the contractor's assignee. In order for a surety to recover such payments, the courts have required the surety to <u>prove that the assignee had knowledge of the contractor's breach or, in some cases, that the assignee actually knew of this breach and also of the surety's claim to the funds.</u>[80] This requirement tracks to the law of restitution that generally allows recovery of money paid to an assignee only in cases where the assignee was guilty of misrepresentation or was aware of a defense to the enforcement of the account." (Fidelity's excerpt underlined).

In support of this proposition, the treatise twice cites the Pennsylvania Supreme Court opinion in <u>Maryland Casualty Co. v. National Bank of Germantown & Trust Co.</u> 320 Pa. 129, 182 A. 362 (1936) (<u>See</u>, footnotes 77 and 80). However, in <u>Maryland Casualty</u>, a surety with an assignment of contract proceeds was denied equitable subrogation against a bank without any assignment of contract proceeds, let alone a perfected security interest therein, on the primary basis that the bank did not have actual knowledge of the contractor's assignment, nor any duty to inquire about it, despite knowledge of the bond. Indeed, in <u>Maryland Casualty</u>, the bank admitted that it had knowledge of contractor's financial difficulty shortly after construction began, but the court held that it was the bonding company that was "unquestionably guilty of laches" for failing "to ascertain from the bank the state of [contractor's] account." <u>Id.</u> at 134. While not on point with the present case, <u>Maryland Casualty</u> does stand for the proposition that a bank's unsecured, unperfected possession of collateral will not be divested by the equitable lien of the bonding company, absent proof that the bank had actual knowledge of both the

3

contractor's assignment of the collateral to the bonding company and the contractor's default on the bond.

In the present case, Royal did not have actual knowledge of the Restoration's default on February 22, 2002, the date Royal deposited the Commonwealth's $222,267.00 progress payment. As of February 22, 2002, Restoration had made every loan payment on time and was not in default on its loan obligations to Royal. (McSwiggan Affidavit, Paragraph 3)  Furthermore, Fidelity's February 15, 2002, letter to the Commonwealth did not even claim that Restoration was in default under its payment bond, stating only that: "I am sure that you would agree that the submission to Fidelity of payment bond claims arising out of RPSS's alleged failure to pay subcontractors triggers the assignment of contract proceeds to Fidelity." (Joint Stipulation, Exhibit M).  Royal's February 20, 2002, response to Fidelity's February 15, 2002, letter states:  "Further, I note that Fidelity has not made any payments to date to any party under its performance and payment bond on behalf of RPSS.  In fact, Mr. Waldman has conceded to Rick Hannye of Royal that at this time Fidelity is in the process of determining the validity of the claims against RPSS.  Until Fidelity has conclusively been able to determine that RPSS was in default of its obligations to its subcontractors (and not merely in a good faith dispute), Fidelity is in no position to make such payments under its bond, and also is in no position to seize RPSS's accounts receivable (especially when there is a prior creditor with the right to direct pay, in the case Royal)." (Joint Stipulation, Paragraph M).   Additionally, Royal contacted Restoration immediately upon receipt of Fidelity's February 15, 2002, letter, and Restoration specifically denied that it was in default of the Window Contract on the bonds issued by Fidelity. (McSwiggan Affidavit, Paragraph 4). Thus, on February 22, 2002, Royal had legitimate reasons to reach its conclusion that Restoration had not defaulted on the performance bonds.[1]

---

[1] Fidelity relies solely on James McSwiggin's February 15, 2002, memo to George McDonough in its attempt to establish Royal's "actual knowledge" of Restoration's default on February 22, 2002.  However, Mr. McSwiggin's February 15, 2002, memo only establishes that Royal was legitimately concerned that Fidelity's February 15, 2002, letter to the Commonwealth, regardless of its merits, might result in the Commonwealth's cessation of progress payments while it sorted out the competing claims of Royal and Fidelity. (McSwiggan Affidavit, Paragraph 5).

**B.      Fidelity's Equitable Claim Must Fail Because It Has Failed to Establish Any Damages Caused By the Commonwealth's Payment to Royal.**

Fidelity has not alleged, let alone proven, that the money lent by Royal to Restoration was used for purposes other than payment for labor and materials needed to perform under the Window Contract. If the money lent by Royal to Restoration was used to pay for labor and materials needed to perform under the Window Contract, then Royal discharged obligations for which Fidelity would otherwise have been liable, and Fidelity was not damaged by the Commonwealth's $222,267.00 progress payment to Royal.  As stated in Coconut Grove Exchange Bank v. New Amsterdam Casualty Co., 149 F.2d 73 (5th Cir. 1945)[2]:

> "But no superior equity in the Surety will appear unless it shows that the money lent by the Bank was diverted, or used for purposes outside the contract, for if the money lent was applied to the payment of labor and materials used in the contract, thereby discharging obligations for which the Surety would otherwise have been liable, the Surety was in no wise injured by the transaction.  It cannot have its liability discharged with the Bank's money and then recover from the Bank money equivalent to that so used for its benefit by its principal.  It is fundamental that one seeking in equity to recover money from another must allege and prove injury – not benefit.

Fidelity's Motion for Summary Judgment must be denied because it has failed to establish any damages caused by the Commonwealth's payment to Royal.

---

[2] See Robert A. Hillman, et al, Common Law and Equity under the Uniform Commercial Code, 24.01[2][b][ii](1985), footnote 80.

**II. CONCLUSION**

For the reasons set forth in defendant, Royal Bank of Pennsylvania's Brief in Support of Motion for Summary Judgment and Brief in Opposition to Plaintiff, Fidelity and Deposit Co. of Maryland's Motion for Summary Judgment, Defendant, Royal Bank of Pennsylvania respectfully requests this Honorable Court to Grant Royal Bank of Pennsylvania's Motion for Summary Judgment and to Deny Plaintiff, Fidelity and Deposit Co. of Maryland's Motion for Summary Judgment.

Respectfully submitted,

_____
Richard S. Hannye, Esquire
732 Montgomery Avenue
Narberth, PA 19072
Phone:  610-668-4700
Fax:  610-668-1185
Attorney for Defendant,
Royal Bank of Pennsylvania

Dated:  December 27, 2002